Kenneth O’Brien, J.
Plaintiff brings this action in behalf of himself and all other similarly situated tenants of premises 36 Central Park South against the owner and managing agent of the premises for injunctive and other equitable relief.
The premises involved is what is generally acknowledged to be a high-class 15-story residential building, located in one of the finest sections of the city. The building is located at Central Park South facing Central Park and is bounded at its eastern ©Extremity by the Hotel Plaza and at the western or Sixth Avenue corner by the Hotel St. Moritz.
*685 The evidence is that the area embracing this building is zoned for residential purposes only, and that the use of this building for purposes other than residential is illegal. In denying an application to rezone this particular area, the City Planning Commission in March, 1950, stated: “ There are too few residential areas in Manhattan as pleasant and attractive as this. In fact, it is one of the residential neighborhoods in which New Yorkers take pride and which visitors from all over the world have paused to admire. * * * Every effort should be made to protect private and public property from the adverse effects of incompatible uses. It would seem to be. obvious that maximum protection should be afforded frontages facing Central Park, which is one of the City’s most valuable possessions.”
The undisputed evidence is that in 1943 the building generally was devoted exclusively to residential use. It was serviced by a staff consisting of two doormen equipped with proper uniforms including ascot ties and white gloves, one furnace man, one porter, one handyman, one relief man, seven elevator men, two switchboard operators to operate the switchboard located in the lobby of the building, plus one resident manager who was on duty at the premises 24 hours a day. All visitors were screened by the doormen and announced through the switchboard before being permitted to use the elevators.
The former owner of the premises, by its president, was called as a witness for the plaintiff. He testified that in 1943, as an inducement to have tenants remain and continue as tenants, he agreed that he would continue to maintain and operate the premises in the same fashion and that as long as they remained in the premises they would continue to enjoy the same services as were then being rendered. He testified further that the landlord’s agreement to continue the services then being rendered was not only the inducing cause for the various tenants to remain in the premises, but that other tenants, two of whom appeared and testified, were induced to leave other quarters in buildings located on the same street and move into this building. There is also evidence to the effect that several years thereafter, several of the tenants consented to a 15% increase in rent on the understanding and agreement that the services would be continued.
These conversations as to the agreement between the former owner and the tenants were received on the theory of admissions against interest by a former owner of real property before parting with the title. (Richman v. Fleisher, 276 App. Div. 574, 578 and authorities therein cited.) They were also received as evi *686 dence of a contract for the rendition of services the breach of Avhich is sought to be enjoined in this action. (Brownrigg v. Herk Estates, 276 App. Div. 566.)
In November of 1943 the building underAvent a change of management and since that time there have been íavo additional owners, the latter of Avhom is one of the defendants in this action. The credible evidence overAvhelmingly establishes that the building has undergone a marked depreciation, both as to physical appearance and method of operation and number and quality of employees.
As against 15 employees, plus a resident manager in 1943, the present staff of employees consist of 8 employees and a superintendent. This notwithstanding a decided increase in income at the present time. The floor coverings and tastefully appointed furniture and furnishings have disappeared from the halls and lobbies and the former practice of daily cleanings and Avashings, so the tenants say, has been supplanted by a haphazard hit or miss system, the result of Avhich is a dirty building. Where in 1943 and prior thereto there had never been a single instance of a violation for dirty or unsanitary conditions, the record discloses that in recent years and up to and including the current year numerous violations Avere filed by the department of buildings for dirty and unsanitary conditions found in and about the premises and the apartments therein due to neglect, inattention and failure to repair.
The SAvitchboard and its operators were removed by the current owner and the number of employees reduced by it by two from the number on the payroll at the time it assumed ownership of the premises. Moreover, the record indicates that shortly prior to the acquisition of the property by the present owner, a doorman was discharged and it is fair to assume that his discharge was in contemplation of the transfer of ownership.
The decrease in the number of employees has been such as to result in a condition at the present time which is dangerous to and destructive of the health, AArelfare and well-being of the tenants and is a constant and ever present menace to their lives and safety. That such conditions constitute a partial eviction cannot be doubted, and were any of the tenants to remove from the premises on account of such conditions it is clear that the conditions prompting such removal could probably be termed a constructive eviction. Unfortunately these tenants are victims of the housing shortage and are unable, as the evidence shows, to find other housing accommodations.
*687 The proof shows that tenants arriving home late at night often find the premises unattended and the single employee charged with the duty of operating hoth the front elevator and the rear elevator engaged in the basement.attending the furnace or elsewhere in connection with other duties, necessitating a long wait in the deserted, unattended lobby. The construction of the building is such that tenants living in apartments located in the front of the building can only be conducted to their apartments by the front elevator and tenants living in the rear of the apartment are obliged to use the rear elevator.
The evidence shows that the front elevator opens directly into the apartments of the tenants residing in the front, thus necessitating some system of screening and announcing visitors in order to prevent intruders and undesirable callers from being precipitately projected into the apartments without prior warning or notification. The evidence is that since the removal of the telephone switchboard and operator numerous instances of such unannounced visits have occurred and there appears to be no satisfactory way of preventing this condition with the present facilities and number of employees. Proof has been adduced of instances where male callers have been precipitated into the apartments of front apartment residents without warning or notification to the embarrassment of the female residents thereof who were disrobed and in the living room in full view of the unexpected callers.
We need not speculate as to the possible harmful consequences which might result from such a state of affairs, except to say that no person should be obliged to reside in an atmosphere of constant terror and apprehension.
It was also shown that in other instances tenants returning home late at night, finding no one in attendance and having become tired of waiting, entered the elevator and in the absence of the operator operated the same in order to get to their apartments. There is nothing to prevent an intruder from doing the same and in a situation of this kind where the elevators open directly into the apartments of the tenants, it is clear that the situation is fraught with hazard of all kind for the tenants.
Proof was also adduced of at least two instances where persons used the elevators late at night and were marooned midway between floors due to a mechanical defect in the elevators, necessitating in each instance delays of from one and three quarters of an hour to three quarters of an hour before help could be summoned to extricate these hapless passengers. In both instances the cries of the passengers awakened tenants who *688 used the stairs to descend to the apartment of the superintendent who was asleep and who had to be awakened to come to their assistance.
What would happen to the tenants in the event of a fire during the night is too horrible to contemplate. That there would be an inevitable large loss of life in the ensuing holocaust is certain, for with the one employee to man the front and rear elevators it is clear that all of the tenants could not be evacuated in time to prevent a serious loss of life.
The failure of the present landlord to decorate or make repairs is clearly established. The provision made by the owner and management for the making of necessary repairs is clearly and woefully inadequate. Instances have been proven of tenants who complained that warped windows and doors make it impossible to keep snow and rain out of these apartments. In such instances makeshift repairs of a crude nature were effected by nailing the window or door securely to its frame, thereby preventing the use of such window or door without at the same time materially affecting the entrance of the rain or snow. At the same time whatever heat is provided for the apartment is permitted to escape through those gaps, making it impossible to maintain a proper temperature.
It is needless to detail the various instances of decreased services except to say in summary, in the language of the former owner, that the building today more nearly resembles a second-rate tenement house than a high-class residence which all parties are agreed it is and should be.
The greatest single change that has occurred in the operation of the building is the character of its present tenancy. There are at present a great number of commercial tenants in this exclusive apartment house in this zoned area. Among these commercial tenants we find a beauty parlor with full equipment in apartment 7-FW; commercial photographer establishment in apartment 9-RW and 11-FW; commercial dress establishment in apartments 6-RW and 3-FW; a commercial hat establishment in 3-FE and an information and news service of the Yugoslavian Government with printing and related equipment in apartments 13-RE, 14-RE, mezzanine west. This is in addition to certain other commercial establishments in apartments 5-RW and 5-FW, to say nothing of the numerous doctors and dentists in the building.
The evidence is that these commercial tenants, in the process of the pursuit of their business activities in the building, seriously discommode the residential tenants and interfere sub *689 stantially with their beneficial use and enjoyment of the premises.
The Yugoslavian agencies, for example, maintain a printing press which, according to the testimony, is in constant operation from early morning until midnight all through the week, the noise of which seriously disconcerts the other tenants and interferes with their rest and sleep. In addition, the noise of the sewing machines employed by the dress establishments makes it impossible for persons to rest during the day and the babble of voices caused by the congregation of large numbers of their employees takes away from the building the tranquil air which one is accustomed to and should expect to find in a home. In addition, large numbers of commercial visitors to these places of business crowd the elevators and make such excessive demands upon their use as to deprive the tenants of the use of same.
Deliveries of bundles are constantly made in the passenger elevators and through the main lobby, resulting in jostling and crowding, and the defendants’ own witness testified that one of the commercial tenants had declared that she would not remain as a tenant unless her sales people, coming and going with boxes of samples, were permitted to use the passenger elevators. The large number of commercial visitors make it impossible to screen visitors to the residential tenants, with the result that the danger of intrusion from criminals and others is real.
The commercial tenants in at least four acknowledged instances succeeded purely residential tenants who had removed from the premises. These commercial tenants were introduced into the building by the present landlord with full knowledge on its part of the illegality of such use. Some of the leases with commercial tenants were made in conjunction with arbitration agreements under the commercial laws, and the leases contain exculpatory clauses absolving the landlord from liability in the event the tenants are obliged to remove from the premises by reason of the violation of the zoning laws and provided further that the leases of these commercial tenants terminate and come to an end on their being required to remove.
The principal witness for the defendants, the president of the defendant managing agent and the treasurer of the defendant owner, testified that he permitted the commercial tenants to come into the building because of the pendency of certain proceedings before the City Planning Commission designed to effect a change in the zoning regulations. The evidence shows, *690 however, that after the City Planning Commission made its disposition in March, 1950, denying the petition for the approved change, and with full knowledge of such action the landlord nevertheless continued to lease in violation.
The use of the premises for commercial purposes is clearly illegal and it seriously and substantially effects important rights of the plaintiff and others similarly cited in such circumstances. An injunction to restrain the continued violation of the zoning ordinance clearly lies. (Marcus v. Village of Mamaroneck, 283 N. Y. 325, 327; see, also, Rice v. Van Vranken, 225 App. Div. 179; Bailer v. Ringe, 255 App. Div. 976.)
The tenants who testified in behalf of the plaintiff made a most favorable impression. They are clearly persons of an exceptionally high type and among them are outstanding men and women from all walks of life. Their testimony was straightforward and convincing and in marked contrast to that of the defendants, which in general seemed unreliable.
These tenants have been long-suffering and patient. They claim, and the evidence abundantly establishes, that the various acts of the defendants and their curtailment of the various services, the cumulative effect of which is to deprive the tenants of the beneficial use and enjoyment of the premises and which constitutes a partial eviction, were designed to make the continued presence of the residential tenants enjoying the protection of the statutory rent laws so untenable as to force their eviction in order to make possible the introduction of new commercial tenants at vastly increased rents. This scheme and design on the part of the defendants is abundantly established by the testimony of the witnesses, and the evidence of the manner and method of the operation of this building by the present owner.
In the prevailing real estate market today, about which there has been some testimony and of which this court can take judicial notice, the tenants have very little choice but to remain in the apartments and continue to suffer from the partial eviction caused by these conditions. To say that these tenants who have contracted for these essential services can be deprived of them with impunity and that this court is powerless to act in such circumstances is to thwart the very aims and purposes of a court of equity. Damages awarded to these tenants cannot assuage their fears or protect them in their lives and property, nor will a diminution of rents afford relief. The tranquility of the home must be respected. These tenants are entitled to live in their homes in peace and security and no reduction of rent *691 and no amount of damages can assure such result. Half measures are inadequate. Nothing short of complete restoration of this building to its original status will suffice. The contract made by the original owner has not been fulfilled by the owners now in possession. Furthermore, they are operating a building in direct violation of the zoning ordinances.
The court will deem the pleadings conformed to the proof.
Judgment is directed in favor of the plaintiff. Settle judgment.